# IN THE UNITED STATES DISTRICT COURT

# FOR THE WESTERN DISTRICT OF OKLAHOMA

BOBBY MANESS, )
        Petitioner, )
vs. ) NO. CIV-15-1108-D
JOE M. ALLBAUGH, Director, Oklahoma )
        Department of Corrections, )
        Respondent.[1] )

## MEMORANDUM OPINION

Petitioner, Bobby Maness, a state court prisoner appearing pro se, has filed a petition for writ of habeas corpus seeking relief pursuant to 28 U.S.C. § 2254. Doc. 8.[2] Petitioner challenges the conviction entered against him in Jefferson County District Court Case No. CF-2013-22. In that case, the trial court found Petitioner guilty of rape by instrumentation in the second degree and sentenced him to fifteen years imprisonment and a $2,500 fine (O.R. 1, 162-64; Tr. 4/29/14, 133; Tr. 6/24/14, 6-7).[3] Petitioner appealed his

---

[1] Pursuant to Fed. R. Civ. P. 25(d), Joe M. Allbaugh, who currently serves as Director of the Oklahoma Department of Corrections, is hereby substituted as the proper party respondent.

[2] Doc. 8 is Petitioner's amended petition, which he subsequently filed to cure a deficiency in his original petition.

[3] Case No. CF-2013-22 was the basis for an application to revoke a seven-year suspended sentence Petitioner received in Jefferson County District Court Case No. CF-2007-53. The trial

conviction to the Oklahoma Court of Criminal Appeals (hereinafter "OCCA"). The OCCA affirmed in an unpublished summary opinion, Maness v. State, No. F-2014-568 (Okla. Crim. App. Aug. 17, 2015).

Petitioner raises five grounds for relief, all of which were presented to the OCCA in his direct appeal. Respondent has responded to the petition. Doc. 14. No reply has been filed. For the reasons set forth herein, the Court finds that Petitioner is not entitled to habeas relief.

## I. Facts.

On June 24, 2013, Petitioner went to the nursing home to visit his mother. While there, he stopped by to see Minia Holloway, who was also a nursing home resident (Tr. 4/29/14, 12, 16, 27-28, 45-46, 49, 78, 92, 107-08, 113-15). Ms. Holloway lived in the nursing home because she was unable to care for herself due to her mental condition. According to Linda Dean, an administrator at the facility, Ms. Holloway needed direction, guidance, and reminders to do certain things like brush her teeth. Based on her experience with Ms. Holloway, Ms. Dean did not believe that Ms. Holloway was able to rationally interpret situations. As Ms. Dean explained, "It depends on how serious, how severe something is. I mean you could tell her something happened to an animal and she would understand that, but you could go into details about something more serious and she may not" (id. at 10, 17-18). Ms. Dean did not think that Ms. Holloway was capable of

court heard these matters together. The trial court revoked the suspended sentence in full and ordered the sentences to be served consecutively (Tr. 4/29/14, 4-7, 131-33; Tr. 6/24/14, 6-7).

2

making serious decisions. She acknowledged that Ms. Holloway is "somewhat" easily confused and that she "might misinterpret somebody's actions" (id. at 18-19).

When Tammy Goehring came to work around 1:45 p.m. on June 24th, she said hello to Ms. Holloway and immediately sensed that something was not right (Tr. 4/29/14, 34-38). Later, around 3:00 p.m., Ms. Goehring assisted Ms. Holloway with a shower. Ms. Goehring noticed that Ms. Holloway was not her usual self. Ms. Goehring described Ms. Holloway as quiet, slow, disoriented, scared, and confused. When Ms. Goehring asked her what was wrong, Ms. Holloway told her what Petitioner did. Ms. Goehring reported the incident to the charge nurse and the police were called (id. at 13-14, 31-33, 38-40).[4] During her interaction with Ms. Holloway, Ms. Goehring noticed some redness on Ms. Holloway's chest. Ms. Holloway told her that "it must have occurred when the conflict was going on" (id. at 42-43).[5]

Ms. Holloway testified that she and Petitioner were friends and that he would come to see her at the nursing home (id. at 48, 64). When Petitioner came to see her on June 24th, she was asleep in her bed (id. at 48-49). Ms. Holloway testified that while she was lying in bed, Petitioner reached under the blanket and her clothes and "started playing with [her]"

---

[4] Ms. Dean testified that Ms. Holloway was very upset when the incident was reported (Tr. 4/29/14, 14). She also testified that Ms. Holloway's demeanor changed after the incident, i.e., she quit eating and would not leave her room (id. at 15-16).

[5] Ms. Dean testified that bruising was noted on Ms. Holloway after the incident. These bruises were not present before the incident (Tr. 4/29/14, 16, 22-25). Ms. Holloway identified a bruise on her arm that was caused by Petitioner (id. at 56; State's Ex. 4).

3

in her private area. She told Petitioner no. Petitioner then grabbed her and told her to get up and stand in front of her closet (id. at 51-53). Ms. Holloway's closet was behind the door to her room (State's Ex. 2). As she stood in front of the closet, Ms. Holloway followed Petitioner's commands to raise her blouse and undo her pants. As Petitioner touched Ms. Holloway, he stroked the front of his pants. Although Ms. Holloway told him not to, Petitioner put his finger in her vagina. Ms. Holloway testified that it hurt and that she told Petitioner to stop many times. Petitioner stopped when a nursing home employee came down the hall (id. at 53-54, 57-58).

Waurika Police Officer Derrick Durbin investigated the incident and questioned Petitioner about it. After waiving his Miranda rights, Petitioner admitted to touching Ms. Holloway's breasts and vagina, but claimed it was consensual. He said that Ms. Holloway unzipped her pants and that he felt her. He told Officer Durbin that there was a chance that he penetrated her, but he "didn't recall." Petitioner admitted that Ms. Holloway told him to stop because it hurt. Petitioner said he stopped for a minute and then continued. When Ms. Holloway complained again that it hurt, Petitioner finally stopped (Tr. 4/29/14, 75-80; State's Ex. 5).

In addition to his interview with Officer Durbin, Petitioner also gave a written statement. In the written statement, Petitioner admits to petting Ms. Holloway's upper leg and giving her a kiss while she was in the bed. He also admits to rubbing Ms. Holloway with her consent, giving such details as being by the door, Ms. Holloway undoing her "britches," and rubbing her until she told him twice to stop because it hurt (Tr. 4/29/14, 80-81, 87-89; State's Ex. 6).

4

Despite his prior statements, Petitioner testified and denied any inappropriate touching of Ms. Holloway. At trial, Petitioner did not even claim that Ms. Holloway consented. Instead, he testified that he "did not rub her and . . . did not penetrate her." In an effort to explain away his written statement to the contrary, Petitioner said that it was the result of him being frustrated, irritated, and mad (Tr. 4/29/14, 113-27).[6]

In addition to his own testimony, Petitioner presented three additional witnesses. Gerald Tallon, the maintenance manager at the nursing home, had known Petitioner's family since before Petitioner was born. He testified that on June 24th he was in the hallway thirty feet from Ms. Holloway's room when he overheard most of the conversation between Petitioner and Ms. Holloway. He described their conversation as cordial. According to Mr. Tallon, the visit ended with a hug and expressions of love and Ms. Holloway was not upset afterwards (id. at 90-103). Another employee, Pamela McCollough, testified that after the incident, Ms. Holloway told her what had happened, but that she did not seem upset about it (id. at 104-06). Petitioner's final witness was his sister, Barbara Porterfield. Ms. Porterfield testified that Petitioner and Ms. Holloway were friends. She also testified that Petitioner had low intelligence and that he was on medication for his nerves (id. at 106-09).

---

[6] Petitioner testified that he maintained his innocence until he got "pissed off" and "mad enough to probably . . . do something that [he] shouldn't do," and that it was in this state of irritation that he wrote the statement (Tr. 4/29/14, 121). He testified further: "I did not penetrate her. Yes, I may have wrote it in the statement, but I don't really know just what I did write in the statement because by the time I was filling out the statement I was irritated, disgusted and mad" (id. at 127). According to Petitioner, these emotions were fueled by the officers' refusal to believe his assertions of innocence (id. at 118, 125).

5

Additional facts will be referenced herein as they relate to the individual grounds for relief raised by Petitioner.

## II. Standard of Review.

Because the OCCA addressed the merits of all of Petitioner's grounds for relief, the Court reviews them in accordance with the standard of relief set forth in 28 U.S.C. § 2254(d). Section 2254(d) requires Petitioner to show that the OCCA's adjudication of his claims either

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

See Cullen v. Pinholster, 563 U.S. 170, 181 (2011) (acknowledging that "[t]he petitioner carries the burden of proof"). The focus of this statutory provision is on the reasonableness of the OCCA's decision. "The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable–a substantially higher threshold." Schriro v. Landrigan, 550 U.S. 465, 473 (2007). In other words, "[i]t is not enough that [this] court, in its independent review of the legal question, is left with a firm conviction that the [OCCA] was erroneous." What is required is a showing that the OCCA's decision is "objectively unreasonable." Lockyer v. Andrade, 538 U.S. 63, 75-76 (2003) (internal quotation marks and citation omitted).

The Supreme Court has repeatedly acknowledged that Section 2254(d) "'erects a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court,'" and that "[i]f [it] is difficult to meet, that is because it was meant to be." White v. Wheeler, 577 U.S. ___, 136 S. Ct. 456, 460 (2015) (quoting Burt v. Titlow, 571 U.S. ___, 134 S. Ct. 10, 16 (2013)); Harrington v. Richter, 562 U.S. 86, 102 (2011). Section 2254(d) "stops short of imposing a complete bar on federal-court relitigation of claims already rejected in state proceedings." Richter, 562 U.S. at 102. What remains, then, is a very narrow avenue for relief, one that permits relief only "*where there is no possibility* fairminded jurists could disagree that the [OCCA's] decision conflicts with [the Supreme] Court's precedents." Id. (emphasis added).

> Section 2254(d) reflects the view that habeas corpus is a "guard against extreme malfunctions in the state criminal justice systems," not a substitute for ordinary error correction through appeal. As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.

Id. at 102-03 (citation omitted).

### III. Analysis.

**A.    Grounds One and Two:    Insufficient Evidence.**

In his first two grounds for relief, Petitioner alleges that the evidence was insufficient to support the trial court's finding of guilt. In Ground One, he argues that the State failed to show that he acted without Ms. Holloway's consent and with the use or threat of force or violence. In Ground Two, Petitioner contends that his conviction cannot stand because Ms. Holloway's testimony was inconsistent, contradictory, and

7

uncorroborated. For the following reasons, the Court finds that no relief is warranted on Petitioner's Grounds One and Two.

Jackson v. Virginia, 443 U.S. 307, 319 (1979), sets forth the familiar standard of review for sufficiency of the evidence claims: "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." As the Jackson Court noted,

> [t]his familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. Once a defendant has been found guilty of the crime charged, the factfinder's role as weigher of the evidence is preserved through a legal conclusion that upon judicial review *all of the evidence* is to be considered in the light most favorable to the prosecution. The criterion thus impinges upon "jury" discretion only to the extent necessary to guarantee the fundamental protection of due process of law.

Id. (footnotes omitted). Judicial review, therefore, is "'sharply limited'" and a reviewing court "must accept the [factfinder's] determination as long as it is within the bounds of reason." Boltz v. Mullin, 415 F.3d 1215, 1232 (10th Cir. 2005) (citations omitted). "[T]he Jackson inquiry does not focus on whether the trier of fact made the *correct* guilt . . . determination, but rather whether it made a *rational* decision to convict . . . ." Herrera v. Collins, 506 U.S. 390, 402 (1993). See also Jackson, 443 U.S. at 318-19 (the question is not whether the reviewing court itself believes that the evidence is sufficient to establish a defendant's guilt beyond a reasonable doubt). Thus, "a federal habeas corpus court faced with a record of historical facts that supports conflicting inferences must presume–even if it does not affirmatively appear in the record–that the trier of fact resolved any such

8

conflicts in favor of the prosecution, and must defer to that resolution." Jackson, 443 U.S. at 326.

In addition to the deference afforded a verdict by Jackson, the AEDPA adds another layer of deference to the Court's review of Petitioner's sufficiency claims.

> The opinion of the Court in Jackson . . . makes clear that it is the responsibility of the [trier of fact]–not the [reviewing] court–to decide what conclusions should be drawn from evidence admitted at trial. A reviewing court may set aside the . . . verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed . . . . What is more, a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court. The federal court instead may do so only if the state court decision was "objectively unreasonable."

Cavazos v. Smith, 565 U.S. 1, 2 (2011) (per curiam) (citation omitted). See also Parker v. Matthews, 567 U.S. 37, 43 (2012) (referring to habeas review of sufficiency claims as a "twice-deferential standard"); Coleman v. Johnson, 566 U.S. 650, 651 (2012) (per curiam) (noting that Jackson claims "are subject to two layers of judicial deference").

Applying the standard set forth in Jackson, the OCCA denied relief. The OCCA held as follows:

> We reject [Petitioner's] claims in his first two propositions challenging the sufficiency of the evidence. After reviewing the evidence in the light most favorable to the State, we find there was ample evidence to establish beyond a reasonable doubt that he forced himself on the victim without her consent and that he committed Second-Degree Rape by Instrumentation. See Postelle v. State, 2011 OK CR 30, ¶ 12, 267 P.3d 114, 126 ("This Court will uphold a verdict of guilt if, after reviewing the evidence in the light most favorable to the State, any rational trier of fact could have found the elements of the charged crime beyond a reasonable doubt."). The evidence—including the victim's testimony, [Petitioner's] statements to police and the corroborating evidence—was sufficient to support [Petitioner's] conviction beyond a reasonable doubt. See Applegate v. State, 1995 OK CR 49, ¶ 17, 904 P.2d 130, 136 (finding the defendant's statements

9

> in which he did not admit lewd molestation, but did admit grabbing the crotch of one of his victims and letting both of his victims sleep with him, corroborated the victims' testimony concerning the defendant's lewd molestation of them).

Maness, No. F-2014-568, slip op. at 2. This is not objectively unreasonable, especially in light of the double deference afforded it.

Petitioner was charged with rape by instrumentation for putting his finger inside Ms. Holloway's vagina without her consent and through the use or threat of force or violence (O.R. 1). See Okla. Stat. tit. 21, §§ 1111(A)(3), 1111.1 (2011). Asserting that Ms. Holloway simply complied or acquiesced to his instructions, Petitioner argues in his Ground One that the State failed to show a lack of consent and the use or threat of force or violence. In support of his argument, Petitioner points to Ms. Holloway's testimony on cross-examination that he did not threaten her. He also claims that the only evidence of force was the prosecutor's suggestion to Ms. Holloway that Petitioner grabbed her. Finally, he downplays Ms. Holloway's testimony about the bruise on her arm following the incident. Pet. at 12-14.

Viewing the evidence in the light most favorable to the State, the OCCA reasonably determined that Petitioner used force against Ms. Holloway. In the first instance, Ms. Holloway testified that Petitioner grabbed her "front" and directed her to go stand by the closet (Tr. 4/29/14, 52-53). The fact that the prosecutor introduced the word "grab" through his questioning does not lessen Ms. Holloway's confirming response. Second, evidence of force was seen on Ms. Holloway's body. Ms. Goehring testified that when she gave Ms. Holloway a shower she noticed redness on her chest (id. at 42-43), and in addition

10

to Ms. Holloway's own testimony about Petitioner bruising her, Ms. Dean also testified to the bruising on Ms. Holloway's body, bruising that was not present before the incident (id. at 16, 22-25, 56; State's Ex. 4). With evidence supporting a finding that force was used, it is of no consequence that Ms. Holloway denied being threatened by Petitioner (id. at 65) as Petitioner's conviction requires the use of force or violence *or* the threat of force or violence, not both.

Regarding consent, the only evidence that Ms. Holloway consented to Petitioner's actions came from Petitioner's self-serving statements to police. And at trial, he did not even maintain this assertion but claimed instead that nothing happened. In addition, the fact that Ms. Holloway complied with Petitioner's requests to stand by the closet, raise her blouse, and undo her pants does not mean she consented to being sexually assaulted given the evidence of force as discussed above and Ms. Holloway's testimony that she told Petitioner no several times (Tr. 4/29/14, 51-53, 57-58). Again, viewing the evidence in the light most favorable to the State, the evidence was sufficient to show the absence of consent.

As for Ground Two, the Court finds that the inconsistencies in Ms. Holloway's testimony do not undermine the OCCA's finding of sufficient evidence. Although Ms. Holloway had some mental limitations, her failure to recall every detail with absolute clarity, like what she was wearing when the incident occurred or which hand Petitioner used to penetrate her, does not negate her entire testimony. Despite her inconsistencies and inability to remember certain details, Ms. Holloway was very clear about what happened (Tr. 4/29/14, 51-54, 57-58, 66, 71). And, as the OCCA found, Petitioner's

conviction is supported by more than just her testimony. The nursing home staff noticed redness and bruising on Ms. Holloway's body (id. at 16, 22-25, 42-43). The staff also testified about the changes in Ms. Holloway's behavior following the incident (id. at 14, 15-16, 33, 35-38, 39). But perhaps the most significant corroboration came from Petitioner himself. Petitioner's statements to the police, with the exception of Ms. Holloway's consent, are eerily consistent with Ms. Holloway's version of events, i.e., that the first touching occurred while Ms. Holloway was in bed, that additional touching happened by the door, that Ms. Holloway undid her pants, that Petitioner rubbed her and may have penetrated her, and that Ms. Holloway asked Petitioner to stop more than once (id. at 79-81; State's Ex. 6).

For the foregoing reasons, the Court concludes that the OCCA did not unreasonably deny Petitioner's claims of insufficient evidence. The trial court, as the trier of fact in this case, heard testimony from both Ms. Holloway and Petitioner as well as others. It was the trial court's responsibility to judge the credibility of the witnesses, resolve the conflicts, and weigh the evidence. Given the presented evidence, and viewing it in the light most favorable to the State as Jackson requires, the Court finds no error in the trial court's verdict or in the OCCA's affirmance. Petitioner's Grounds One and Two are hereby denied.

**B.    Ground Three:    Impartial Tribunal.**

In Ground Three, Petitioner asserts that the trial judge overstepped his bounds by questioning witnesses. Although Petitioner acknowledges that Oklahoma law permits a judge to question witnesses, see Okla. Stat. tit. 12, § 2614(B) (2011), he claims that the judge's questioning in his case denied him due process. See Tumey v. Ohio, 273 U.S. 510,

535 (1927) (acknowledging the right to an impartial judge). For the following reasons, the Court finds that the OCCA was not unreasonable in denying Petitioner relief on this claim.

The record reflects that the trial judge questioned four witnesses, two State witnesses and two defense witnesses. The judge questioned two nursing home employees about injuries on Ms. Holloway's body (Tr. 4/29/14, 22-25, 42-43), and he questioned another nursing home employee and Petitioner's sister about their respective vantage points in relation to Ms. Holloway's room (id. at 103, 112). Claiming that the judge's questions "were designed to establish facts in favor of the State's case," Petitioner asserts that the judge crossed the line from impartial adjudicator to advocate. Pet. at 25. The OCCA disagreed. Reviewing for plain error because Petitioner failed to raise any objection at trial, the OCCA found that "[t]he questions propounded by the trial court to both State and defense witnesses was an effort to clarify testimony for its own benefit." The OCCA additionally found that "[t]he questions were not designed to establish facts in favor of the State's case but rather to elicit the truth, and they did not indicate the court's views one way or the other." Maness, No. F-2014-568, slip op. at 3. This is a reasonable determination.

"Ordinarily, when a judge's words or actions are motivated by events originating within the context of judicial proceedings, they are insulated from charges of bias." United States v. Nickl, 427 F.3d 1286, 1298 (10th Cir. 2005) (citing Liteky v. United States, 510 U.S. 540, 554-56 (1994)). In Petitioner's case, the judge asked follow-up questions to witnesses. As noted above, under Oklahoma law, a judge is permitted to ask questions, and despite Petitioner's argument to the contrary, the questions themselves do not show

13

any bias or partiality. The questions were relevant points of clarification and/or elaboration on the witnesses' testimony. Moreover, Petitioner had a non-jury trial. Since the judge was also the trier of fact, there is no concern that the judge's questions had any influence on a jury determination and it appears, as the OCCA found, that the judge was simply seeking the truth to make a just determination. See United States v. Articles of Device "KuF Diatherapuncteur, etc. * * * Detecteur Niboyet GMG Schmidt D'Acupuncture", 481 F.2d 434, 436 (10th Cir. 1973) ("Within reasonable bounds, the trial court has the right to participate in questioning witnesses and may otherwise attempt to bring out the truth, especially in cases tried without a jury."); Moore v. Strong, 360 F.2d 71, 77 (10th Cir. 1966) ("[T]he presiding judge has not only the power but the duty to elicit the truth."). The Court therefore concludes that the OCCA's denial of relief on Petitioner's Ground Three was not objectively unreasonable.

**C.     Ground Four:     Excessive Sentence.**

Petitioner's Ground Four is a challenge to his sentence. Claiming that his sentence is "shockingly excessive," Petitioner asks the Court to modify it. Pet. at 26. The OCCA reviewed Petitioner's sentence and found that no modification was warranted. Maness, No. F-2014-568, slip op. at 3-4. Because Petitioner admits that his fifteen-year sentence is within the statutory limits, no further action by this Court is required. See Dennis v. Poppel, 222 F.3d 1245, 1258 (10th Cir. 2000) (acknowledging that sentence challenges are not cognizable in federal habeas proceedings and that "review of a sentence ends once [the court] determine[s] the sentence is within the limitation set by statute"). Ground Four is therefore denied.

D.   Ground Five:   Cumulative Error.

In his final ground, Petitioner seeks relief based upon a cumulative error theory. "A cumulative-error analysis . . . aggregates all the errors that individually have been found to be harmless . . . and it analyzes whether their cumulative effect on the outcome of the trial is such that collectively they can no longer be determined to be harmless." <u>United States v. Rivera</u>, 900 F.2d 1462, 1470 (10th Cir. 1990). A petitioner has no basis for cumulative error relief in the absence of two or more errors. <u>Hanson v. Sherrod</u>, 797 F.3d 810, 852 (10th Cir. 2015). No error was found by the OCCA or by this Court. Accordingly, Petitioner's Ground Five presents no basis for relief and is therefore denied.

## IV. Conclusion.

Having concluded that Petitioner's arguments do not establish a right to relief, his petition for writ of habeas corpus is **DENIED**. Doc. 8. A certificate of appealability is also **DENIED**. Judgment will enter accordingly.

IT IS SO ORDERED this 21st day of December, 2017.

_____
TIMOTHY D. DeGIUSTI
UNITED STATES DISTRICT JUDGE